IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge John L. Kane

Civil Action No. **06-cv-2089-JLK-DLW**

**COLORADO WILD, INC., and
SAN LUIS VALLEY ECOSYSTEM COUNCIL**,

      Plaintiffs,

v.

**UNITED STATES FOREST SERVICE, A Federal Agency within the U.S. Department of
Agriculture,**

      Defendant,

and

**LEAVELL-McCOMBS JOINT VENTURE,**

      Intervenor-Defendant.

---

**ORDER ON RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE**

---

Kane, J.

      Plaintiffs Colorado Wild, Inc. and San Luis Valley Ecosystem Council challenge the

decision of the Defendant United States Forest Service ("Forest Service") to grant special use

authorization for certain rights-of-way across National Forest System ("NFS") lands.  It is before

me on the Findings and Recommendations Re:  Plaintiffs' Motion to Continue Preliminary

Injunction Through Decision on the Merits by Magistrate Judge David L. West (Doc. 94).  In the

referenced Motion (Doc. 86), Plaintiffs request that the preliminary injunction stipulated by the

parties and entered as an order of this Court on November 22, 2006, be continued until this Court

issues its final decision on the merits of Plaintiffs' challenge to the Forest Service's decision.

The magistrate judge recommended that I grant Plaintiffs' motion and continue the previously stipulated injunction with modifications clarifying that it does not prohibit the Forest Service from conducting certain activities not related to the decision under review. The Forest Service and Intervenor-Defendant Leavell-McCombs Joint Venture ("LMJV") timely filed separate objections to the magistrate judge's recommendation, and Plaintiffs timely responded to these objections.

Under Rule 72(b), my review of the magistrate judge's Findings and Recommendations is *de novo* as to any portion to which specific written objection was made, and I may accept, reject, or modify the recommendations under this standard. One or both of the Defendants objected to almost every aspect of the magistrate judge's report and his ultimate recommendation that I grant Plaintiffs' motion. I have, therefore, carefully reviewed the magistrate judge's Findings and Recommendations, Defendants' objections to them and Plaintiffs' response thereto, Plaintiffs' Motion to Continue Preliminary Injunction and related briefing and exhibits, together with relevant authority, documents and pleadings. Based on this *de novo* review, and for the reasons stated below, I accept the magistrate judge's recommendation and grant Plaintiffs' request for continued preliminary injunctive relief.

<u>Background</u>

The following facts are undisputed unless otherwise stated:

In June, 2001, LMJV applied to the Forest Service for rights-of-way across NFS lands for access and utility corridors from U.S. Highway 160 to private land it owns within the Rio Grande National Forest.[1] The private land to be served is a 287.5 acre parcel located near the summit of

---

[1]     LMJV amended its access application in 2003.

Wolf Creek Pass.  It is entirely surrounded by NFS lands, but is currently accessible by vehicle from U.S. Highway 160 via Forest System Road 391 ("FSR 391"), a single-track gravel road open to public vehicular use from mid-June through September.

LMJV sought the additional access and utility corridors in order to facilitate the construction and operation of a year-round resort on its property to be known as the Village at Wolf Creek ("the Village").  LMJV requested that the Forest Service provide additional access to the planned Village by allowing the extension of an existing road, known as Tranquility Road, which serves one of the parking lots to the adjacent Wolf Creek Ski Area.[2]  LMJV also represented to the Forest Service and others that it could and would build and operate the Village as planned using FSR 391 if needed, without the additional access and utility corridors it requested.

As conceived by LMJV, the Village at full build-out would consist of more than 2,100 residential and commercial buildings and house approximately 10,000 people.  It would also include parking facilities for more than 4500 vehicles, two power plants and a wastewater treatment plant sufficient to serve a community of this size.  Build-out would occur over a 20-year period.  The Village would have ski-in, ski-out access to the Ski Area.

The proposed Village is located in Mineral County, a mostly rural county with a current population of less than 1000.  In late 2004, while LMJV's access application was pending before the Forest Service, the Mineral County Board of Commissioners approved the Village as

---

[2]     The Ski Area is operated by the Wolf Creek Ski Corporation on NFS lands subject to a special use permit.  The Ski Corporation is not associated with LMJV or the proposed Village development, and is currently in litigation with LMJV over issues relating to the proposed Village development.  *See Wolf Creek Ski Corp. v. Leavell-McCombs Joint Venture*, No. 04-cv-1099-JLK (D. Colo.).

described above as a Planned Use Development ("PUD").  This final subdivision approval was challenged in state court by Wolf Creek Ski Corporation, Colorado Wild and San Luis Valley Ecosystem Council on numerous grounds.  In October, 2005, the state district court for Mineral County vacated the County's approval upon finding that the limited access FSR 391 provided to the planned development was not adequate under state law.[3]  *Wolf Creek Ski Corp. v. Bd. of County Comm'rs*, No. 2004CV12, Findings of Fact and Conclusions of Law (Colo. Dist. Ct. Mineral Cty. Oct. 13, 2005).  In its decision, the state court noted that the PUD approved by Mineral County anticipated that the main entrance to the Village would be through or parallel to the lower Ski Area parking lot, *i.e.*, the Tranquility Road access requested by LMJV, and that the current plat of the Village would have to be revised if the Forest Service selected another access alternative.  *Id.* at 33, 37.  The Colorado Court of Appeals recently affirmed the district court's decision with directions that the matter be remanded to the County for further proceedings.  *Wolf Creek Ski Corp. v. Bd. of County Comm'rs*, No. 06CA0113 (Colo. Ct. App. Sept. 20, 2007).

Meanwhile, in response to LMJV's application for additional access to its property, the Forest Service had determined that an Environmental Impact Statement ("EIS") analyzing the proposal and alternatives was required by the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4332 *et seq*.  As is customary, the Forest Service entered into a Memorandum of Understanding ("MOU") with LMJV in which LMJV agreed to hire and pay a third-party contractor, selected by the Forest Service, to prepare the necessary NEPA analysis.  The MOU

---

[3]     Colo. Rev. Stat. § 30-28-133.1 requires that all lots and parcels created by a proposed subdivision have access to the state highway system.  This connection must be provided for in the subdivision application before it can be approved.  *See Wolf Creek Ski Corp. v. Bd. of County Comm'rs*, No. 06CA0113, slip op. at 10-11 (Colo. Ct. App. Sept. 20, 2007).

provided that the NEPA contractor would serve under the direct supervision and control of the Forest Service and included a protocol governing communications between the contractor, Forest Service and LMJV in connection with the EIS process.  The Forest Service selected Tetra Tech, Inc. to prepare the EIS.

In March 2006, following publication of a draft EIS and a public comment period, the Forest Service issued the Final Environmental Impact Statement ("FEIS") prepared by Tetra Tech and its Record of Decision ("ROD") on LMJV's access application.  The FEIS focused on four alternative responses to LMJV's access request: (1) the NEPA-mandated "no action" alternative; (2) LMJV's request for a single additional access to the property via an extension of  Tranquility Road; (3) a single access alternative using a new, to-be-constructed road, referred to as the "Snow Shed Road," which would connect with Highway 160 approximately 1/3 mile east of the current Tranquility Road-Highway 160 intersection; and (4) a dual access alternative that requires construction and use of both the Snow Shed Road and the extended Tranquility Road.

In the ROD, the Forest Service selected Alternative 4, the dual access alternative authorizing both the Tranquility Road extension and the new Snow Shed Road.  For reasons of public safety and compatibility with Ski Area operations, the agency designated the Snowshed Road as the primary access for Village development and operation, and limited use of Tranquility Road during the ski season to emergency and mass transit use only.  In the FEIS and ROD, the Forest Service also recognized that neither road could be utilized as planned without a highway access permit issued by the Colorado Department of Transportation ("CDOT").  As a result, the Forest Service also required LMJV to obtain the necessary permits as a precondition to the agency authorizing LMJV's construction or use of either road.  ROD at 6 (WC06779).

Plaintiffs and LMJV both filed administrative appeals of the FEIS and ROD, which were denied by Deputy Regional Forester Greg Griffith.  LMJV then petitioned the Secretary of Agriculture, the Chief of the Forest Service and others to reverse this decision and amend the ROD, renewing its request that it be allowed to build and utilize the Tranquility Road extension on a year-round basis, and arguing that the Snow Shed Road access requirement should either be delayed or abandoned because of its cost and the significant amendments it would require to Village development plans.  The Secretary denied the petition for lack of jurisdiction.  Shortly thereafter, however, in a letter dated August 28, 2006, Forest Supervisor Clark responded to LMJV's petition by notifying LMJV that it could proceed with construction and unrestricted use of the Tranquility Road outside of the ski season, and could delay construction of the Snowshed Road until some undetermined later date.  In October, 2006, the Forest Service acted on this determination by preparing to issue LMJV a Special Use Permit authorizing construction of the Tranquility Road extension.

In response, on October 19, 2006, Plaintiffs filed this action against the Forest Service, alleging that the FEIS and ROD, as well as the Forest Supervisor's August 28, 2006 decision allowing LMJV to proceed with construction and use of only the Tranquility Road, were arbitrary and capricious under the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, and in violation of NEPA and its implementing regulations.  Plaintiffs seek declaratory and permanent injunctive relief barring the Forest Service and LMJV from implementing the ROD until these violations are corrected by preparation of an EIS considering the proposed action and all connected actions, as well as a full range of alternatives and appropriate mitigation measures. LMJV requested and was granted leave to intervene.

On November 16, 2006, I granted Plaintiffs' request for a temporary restraining order prohibiting the Forest Service from authorizing any ground disturbing construction activity on the Snowshed or Tranquility Roads or FSR 391, from submitting applications or entering into agreements with CDOT for access permits for these roads or from taking any other action implementing the FEIS and ROD. The parties, joined by LMJV, subsequently agreed to continue the terms of this restraining order in a stipulated preliminary injunction to continue until May 1, 2006. The May 1 expiration date, later extended by agreement until June 15, 2007, was selected in hope that compilation of the administrative record for the FEIS and ROD, briefing on the merits of Plaintiffs' claims and this Court's decision on the merits could be completed by this date and before the beginning of the 2007 construction season.

This hope was not realized. Although progress has been made, the parties have yet to resolve all issues concerning the completeness of the administrative record. As a result, briefing has not yet commenced on the merits. Once the few remaining issues relating to the administrative record have been decided, it is the desire and intent of all parties to proceed promptly to briefing, and a decision, on the merits of Plaintiffs' challenge to the Forest Service's access decision. Until this occurs Plaintiffs seek a continued preliminary injunction barring Defendants from implementing the FEIS and ROD.

<u>Preliminary Injunction Standard</u>

In order to receive a preliminary injunction, a plaintiff must establish the following four factors: (1) that the plaintiff will suffer irreparable harm if the preliminary injunction is denied; (2) that the threatened injury to the plaintiff outweighs any injury the opposing party would suffer under the preliminary injunction; (3) that the injunction is not adverse to the public interest; and

(4) that the plaintiff has a substantial likelihood of success on the merits of the case.  *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004).  If a plaintiff establishes that the first three factors "tip strongly" in its favor, the likelihood of success inquiry is modified somewhat, and the plaintiff may establish this factor "by showing that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation."  *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003).  Because a preliminary injunction is an extraordinary remedy, "the right to relief must be clear and unequivocal."  *Dominion Video*, 356 F.3d at 1260.

<u>Analysis of Preliminary Injunction Factors</u>

The magistrate judge recommended that I find the Plaintiffs had established each of the four preliminary injunction factors.  I agree and accept his recommendation for the reasons stated below.

A.      Irreparable harm

NEPA's purpose is to influence the decision making process "by focusing the [federal] agency's attention on the environmental consequences of a proposed project," so as to "ensure[] that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast."  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).  "[W]hen a decision to which NEPA obligations attach is made without the informed environmental consideration that NEPA requires, the harm that NEPA intends to prevent has been suffered."  *Sierra Club v. Marsh*, 872 F.2d 497, 500 (1st Cir. 1989)(Breyer, J.) (quoting *Commonwealth of Massachusetts v. Watt*, 716 F.2d 946, 952

(1st Cir. 1983) (emphasis omitted)).  This harm is considered harm to the environment because "the 'risk implied by a violation of NEPA is that real environmental harm will occur through inadequate foresight and deliberation' by the action federal agency."  *Catron Cty. Bd. of Commissioners v. United States Fish & Wildlife Serv.*, 75 F.3d 1429, 1433 (10th Cir. 1996) (quoting *Marsh*, 872 F.2d at 504).   Accordingly, the Tenth Circuit has held, harm to the environment is presumed when an agency fails to comply with NEPA.  *Davis v. Mineta*, 302 F.3d 1104, 1115 (10th Cir. 2002).

In order to meet their burden in seeking preliminary injunctive relief, Plaintiffs must make a specific showing that this environmental harm results in irreparable injury to their specific environmental interests.  *Id.* at 1115.  Plaintiffs have presented evidence that they will suffer irreparable injury to their environmental interests, in the form of environmentally destructive road construction and construction of the Village, if the Forest Service and LMJV are permitted to act on the Forest Service's access decision before this case is decided.  This showing satisfies the Plaintiffs' burden of demonstrating irreparable harm if the preliminary injunction is denied.

Defendants do not dispute that irreparable injury will occur if road and Village construction are allowed to proceed as contemplated by the ROD.  They argue this conclusion is immaterial, however, because the irreparable injury analysis must be confined to the specific activities the Forest Service and LMJV seek to perform while this challenge to the ROD remains pending before the court.  The activities Defendants seek to perform during this period consist of: (1) LMJV's design and construction of the Tranquility Road extension to the Village property; (2) LMJV's use of Tranquility Road until November 15, 2007 for up to 100 vehicle trips per month to the property for the purpose of investor relations and baseline engineering and design

work; (3) LMJV and the Forest Service's application to CDOT for authorization for LMJV to use

Tranquility Road in this manner; (4) LMJV's performance of engineering and design work for the

Snowshed Road through issuance of special use permits by the Forest Service, and Forest Service

review and approval for LMJV's engineering, design and construction plans for this road; and

(5) LMJV and the Forest Service undertaking meetings and conducting further planning regarding

the proposed Village, including preparation of applications to CDOT for access to US Highway

160 via the Tranquility and Snowshed Roads as contemplated by the ROD. *See* LMJV's

Proposed Order on Prel. Inj. Relief (Doc. 109-3) (attachment to LMJV's Objs. to Magistrate's

Findings and Recommendation).  Defendants propose entry of a preliminary injunction order that

permits these activities while enjoining any other ground-disturbing activities related to the Forest

Service's access decision.

Defendants contend that allowing these specific activities to proceed under the ROD will

not cause irreparable injury because, aside from construction of Tranquility Road, all involve

minimal ground disturbance and thus minimal environmental harm.  LMJV further asserts that the

environmental harm that would result from construction of the Tranquility Road extension is not

irreparable because the road can be demolished and the affected land regraded and reseeded

through use of a reclamation bond LMJV will post for this purpose in the event the Forest Service

ROD is ultimately reversed.

Defendants understate the amount of on-the-ground harm that would result from

construction and use of the Tranquility Road extension and the degree to which it may be

reparable.[4]  More importantly, they ignore the primary injury that would result from allowing the

proposed activities to proceed, which is the difficulty of stopping "a bureaucratic steam roller"

once it is launched.  *See Davis*, 302 F.3d at 1115 & n.7.  All of the activities Defendants propose

to undertake while this action is pending are based on and in furtherance of the decision that is

being challenged, the Forest Service's decision to grant access to LMJV's property via the

Tranquility Road and the new Snowshed Road.  Each step taken by LMJV, the Forest Service,

CDOT and other relevant governmental agencies to implement or in reliance on this decision

"represents a link in the chain of bureaucratic commitment that will become progressively harder

to undo the longer it continues." *Marsh*, 872 F.2d at 500 (quoting *Watt*, 716 F.2d at 953).

"Once large bureaucracies are committed to a course of action, it is difficult to change that course

- even if new, or more thorough, NEPA statements are prepared and the agency is told to

'redecide.'" *Id.*  Thus, the irreparable injury threatened here is not simply whatever ground-

disturbing activities are conducted in the relatively short interim before this action is decided, it is

the risk that in the event the Forest Service's FEIS and ROD are overturned and the agency is

required to "redecide" the access issue, the bureaucratic momentum created by Defendants'

---

[4]      LMJV reports that construction of the 250 foot Tranquility Road extension will require placement of up to 5,000 cubic yards of fill material to be excavated and transported from LMJV's property, and the importation of up to an additional 500 cubic yards of rocks and boulders.  LMJV's Proposed Order at 3-4.  This is a significant amount of disturbance notwithstanding the relatively short length of the road.  As to LMJV's assertion that the injury from this road construction is reparable, Plaintiffs have presented a declaration from Ryan Bidwell, who holds a BS in Environmental Science and MS in Forest Policy and has professional experience in conservation of mountain environments, that the scarring, erosion and other effects of these construction activities would remain for many, many years due to the short growing season in this high mountain environment.  *See* Second Bidwell Decl., ¶ 6 (Doc. 86-10) (attachment to Pls.' Mot. to Continue Prel. Inj.).

activities will skew the analysis and decision-making of the Forest Service towards its original, non-NEPA compliant access decision.

The Tenth Circuit and other courts have affirmed that this type of harm is irreparable and can support issuance of a preliminary injunction. *E.g.*, *Davis*, 302 F.3d at 1115 & n.7; *Marsh*, 75 F.3d at 499-504. In *Davis*, for example, the Tenth Circuit considered whether the district court erred in failing to enjoin a multi-phase highway project that was allegedly approved without compliance with NEPA and other statutory review requirements. The project proponents argued that the plaintiffs would not suffer irreparable injury if the project was allowed to proceed because the on-the-ground environmental harms asserted by Plaintiffs would arise principally from construction scheduled to occur in a later phase of the project, long after the plaintiff's suit would have been decided. *Davis*, 302 F.3d at 1115 n.7. The Tenth Circuit rejected this argument, finding instead that irreparable harm under NEPA was established because "[i]f construction goes forward on Phase I, or indeed if any construction is permitted on the Project before the environmental analyses is complete, a serious risk arises that the analysis of alternatives required by NEPA will be skewed toward completion of the entire Project." *Id*. The same being true here, I find Plaintiffs have established that they will suffer irreparable injury unless the preliminary injunction they seek is issued.[5]

---

[5]     LMJV cites a 1994 decision of this Court, *George Washington Home Owners Assns., Inc. v. Widnall*, 863 F. Supp. 1423, 1427 (D. Colo. 1994), for the proposition that a plaintiff in a NEPA action must show "tangible harm to the environment" before an injunction will issue. To the extent this language can be read as requiring proof of imminent, tangible physical injury to the environment to establish irreparable injury in a NEPA action, it conflicts with more recent Tenth Circuit authority. *See Davis*, 302 F.3d at 1114-15 (reversing district court, which had found no irreparable injury based on a lack of "specific, tangible assertions of harm," and finding irreparable injury based on the "difficulty of stopping a bureaucratic steam roller, once started").

B.      Balance of Harms

I also agree with the magistrate judge that Plaintiffs have established that the threatened injury to them outweighs any injury the Forest Service or LMJV would suffer under the preliminary injunction.

The only possible harm asserted by the Forest Service is that Plaintiffs' proposed injunction might be read to prevent it from undertaking maintenance and other activities that are unrelated to implementation of the challenged access decision.  The Forest Service acknowledges that this harm can be cured through the addition of language clarifying that the actions enjoined are those related to implementation of the FEIS and ROD, and Plaintiffs have proposed that such clarifying language be included in the preliminary injunction.

LMJV asserts the balance of harms tips against it and hence against issuance of the injunction because it will suffer pecuniary, lost opportunity and investment risks if it is prevented from constructing and using the Tranquility Road as proposed and from applying for the CDOT highway access permits required by the ROD.  Such economic harm, however, is not irreparable and does not outweigh the serious risk that irreparable environmental harm will result if LMJV is allowed to proceed with road construction and other development-related activities in reliance on the Forest Service's access decision.  *See, e.g.*, *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1125 (9th Cir. 2005) (affirming preliminary injunction in NEPA case in part because, while developer "may suffer financial harm" if injunction issued, balance of harms favored issuance of injunction where irreparable harm was likely if development was allowed to proceed without proper review); *National Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 738 (9th Cir. 2001) (economic harm to tour operator if injunction issued does not outweigh

13

potential irreparable damage to environment); *Northern Alaska Envtl. Ctr. v. Hodel*, 803 F.2d 466, 471 (9th Cir. 1986) (more than pecuniary harm must be shown to outweigh environmental harm).

LMJV also argues it will be harmed if the injunction issues because it will deprive LMJV of its right, pursuant to section 1323(a) of the Alaska National Interest Lands Conservation Act ("ANILCA"), 16 U.S.C. § 3210(a), to obtain access to its property across National Forest System lands "as the Secretary [of Agriculture] deems adequate to secure the owner the reasonable use and enjoyment" of its property "subject to such terms and conditions as the Secretary of Agriculture may prescribe." *Id.* Leaving aside for the moment the parties' contentions regarding the nature of this statutory right and the role it played in the Forest Service's review and decision-making,[6] it is undisputed that LMJV currently has direct, seasonal, vehicular access to its property via FSR 391. Nothing in the parties' arguments or the record to date indicates that LMJV cannot utilize FSR 391 for the limited seasonal purposes, *i.e.*, investor relations and baseline surveying and engineering studies, it seeks to perform while this Court decides the merits of Plaintiffs' claims.[7] There is also nothing in the record indicating that LMJV and its engineers cannot access LMJV's property by simply walking the 250 feet from the current edge of Tranquility Road to the LMJV property line. Whatever inconvenience these modes of access might impose on LMJV, this inconvenience does not deprive LMJV of access to its property during the pendency of this action or otherwise constitute harm sufficient to outweigh the irreparable injury to Plaintiffs if the

---

[6]       *See infra* note 15 and accompanying text.

[7]       I need not decide at this time whether LMJV's use of FSR 391 for these purposes would require special use authorization from the Forest Service.

14

injunction is not issued.[8]  I am also at a loss to understand how LMJV could represent to the

Forest Service during the EIS process that it could and would construct the Village utilizing only

FSR 391 and now contend that it cannot even conduct preliminary survey, baseline engineering

and design work for the Village unless it has vehicular access to the property via an extended

Tranquility Road.  For all of these reasons, I find the balance of harms supports issuance of the

preliminary injunction.

       C.      Adversity to Public Interest

       I also conclude that the preliminary injunction sought by Plaintiffs is not adverse to the

public interest.  The public has an undeniable interest in the Forest Service's compliance with

NEPA's environmental review requirements and in the informed decision-making that NEPA is

designed to promote.  The thousands of public comments submitted on the draft EIS, the majority

of which reportedly opposed LMJV's access request and development plans, also demonstrate the

public interest in maintaining the status quo by not allowing the Forest Service and LMJV to

begin implementation of the ROD until this challenge to the Forest Service's decision is fully

resolved.

       Contrary to LMJV's claim, continuation of the preliminary injunction for this period is not

adverse to whatever public interest exists in LMJV's right to access its property under ANILCA

because LMJV currently has adequate access to its property to perform the survey, baseline

engineering and design work it seeks to exempt from the preliminary injunction.  To the extent

Mineral County's approval of LMJV's Village development plan in late 2004 is evidence of the

---

[8]     LMJV's access to its property for these purposes via these routes also undermines
its claims concerning the economic harm it will suffer if it is not permitted to build and use the
Tranquility Road before the merits of Plaintiffs' claims are decided.

public interest against continuation of the injunction, that evidence is undermined by the state

court's subsequent ruling that this approval was arbitrary and capricious and not in accordance

with law.[9]

> D.      Likelihood of Success on the Merits

The final prerequisite to continuation of the previously stipulated injunction is that

Plaintiffs demonstrate a substantial likelihood of success on the merits of one or more of their

claims.  The magistrate judge found, and I agree, that Plaintiffs have established that the first three

preliminary injunction factors "tip strongly" in their favor, so that they may establish this final

factor "by showing that questions going to the merits are so serious, substantial, difficult, and

doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation."

*Greater Yellowstone Coalition*, 321 F.3d at 1256.  In other words, Plaintiffs may carry their

burden of demonstrating likelihood of success on the merits for preliminary injunctive purposes by

demonstrating a "fair ground for litigation" of one or more of their claims.  *See Heideman v.*

*South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003); *Resolution Trust Corp. v. Cruce*,

972 F.2d 1195, 1199 (10th Cir. 1992).[10]

Plaintiffs assert four claims alleging that the Forest Service violated NEPA and/or the

Administrative Procedures Act in deciding to grant LMJV additional access to its property across

---

[9]      Even if this were not the case, in light of the other public interests implicated here,
I would not find the County's approval of the proposed Village sufficient to render issuance of the
preliminary injunction adverse to the public interest.

[10]      Although there are several situations in which this more lenient standard is not
applicable even when the equities tip heavily in favor of preliminary injunctive relief,  *see*
*Heideman*, 348 F.3d at 1189 (fair-grounds-for-litigation standard inapplicable when preliminary
injunction seeks to stay governmental action taken in public interest pursuant to statutory or
regulatory scheme); *Bray v. QFA Royalties LLC*, 486 F. Supp. 2d 1237, 1244 (D. Colo. 2007)
(same when type of injunction sought is disfavored under the law), none of them exist here.

NFS lands.  In assessing the merits of these claims to determine if Plaintiffs have met their burden

with respect to the requested injunction, I apply the highly deferential "arbitrary and capricious"

standard of review.  *Davis*, 302 F.3d at 1111.  Under this standard, an agency decision may only

be set aside if the action was "arbitrary, capricious, an abuse of discretion or otherwise not in

accordance with law or if the action failed to meet statutory, procedural, or constitutional

requirements."  *Valley Community Preservation Comm'n v. Mineta*, 373 F.3d 1078, 1084

(10th Cir. 2004) (internal quotations omitted).

 The magistrate judge recommended that I find Plaintiffs had met their burden on this final

preliminary injunction factor with respect to each of their four claims.  I agree and accept this

recommendation for the reasons stated below.

  1. Connected actions

 Plaintiffs first allege that the Forest Service violated NEPA and arbitrarily and unlawfully

limited the scope of their analysis in the FEIS and ROD by failing to analyze the impacts of at

least two "connected actions" to LMJV's access request:  (1) the design, construction and CDOT

permitting of the interchange(s) to connect the approved access road(s) to U.S. Highway 160; and

(2) LMJV's development of the Village.  The basis of this claim is the requirement, stated in

NEPA's implementing regulations, that the environmental impact statement for a project must

identify and include analysis of any actions that are "connected" to the project under review.  *See*

40 C.F.R. § 1508.25 (2006); *Utahns for Better Transp. v. United States Dep't of Transp.*,

305 F.3d 1152, 1182 (10th Cir. 2002), *modified in part on other grounds*, 319 F.3d 1207 (2003).

 NEPA's implementing regulations define "connected actions" as actions that "are closely

related" to the action under review because the actions:  "(i) Automatically trigger other actions

which may require environmental impact statements.  (ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.  (iii) Are interdependent parts of a larger action and depend on the larger action for their justification."  40 C.F.R. § 1508.25(a)(1).  Projects that have "independent utility" are not "connected actions" under this regulation.  *Utahns for Better Transp.*, 305 F.3d at 1183.

The Forest Service and LMJV concede that NEPA and its implementing regulations required the Forest Service to consider the impacts of both the highway interchanges and the Village development in the environmental impact statement analyzing LMJV's access request. They argue, however, that these actions cannot be "connected actions" under NEPA's regulations because the Forest Service lacks authority to control them.  Instead, Defendants argue, the effects of these actions are properly viewed as "cumulative impacts" of LMJV's access request, which, under NEPA's regulations, also must be addressed in the EIS analyzing this request.  *See* 40 C.F.R. § 1508.25(c)(3) (requiring agency to include consideration of "cumulative impacts" in EIS).  Defendants further assert that the effects of both actions were in fact adequately addressed as cumulative impacts in Ch. 4 and Addendum A of the FEIS.  In an alternative but related argument, Defendants contend there is no legal or practical significance to consideration of the effects of these actions under the "connected action" or "cumulative impact" label, and that the proper inquiry is only whether these effects were considered under some rubric in the environmental impact statement for LMJV's access proposal.

I find this claim presents questions "so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation."  *Greater Yellowstone Coalition*, 321 F.3d at 1256.  With respect to the connection of the Forest Service-

approved Village access routes to Highway 160, there is no question that these connections are "interdependent parts" of the larger action that "depend on the larger action for their justification" and/or "cannot or will not proceed unless" the Forest Service approves additional means for LMJV to access its property.  Nor do these interchanges or the Forest Service-approved access roads have any utility independent of each other.  On their face, therefore, the design, construction and permitting of the Highway 160 interchange(s) satisfy the regulatory definition of a "connected action."[11]

Defendants provide little support in the current briefing for their summary assertion that an action meeting the regulatory definition of a "connected action" nonetheless cannot be analyzed as a "connected action" in an EIS unless the decision-making agency has authority to control it. Even if this were the case, moreover, there is a substantial question as to whether the Forest Service has such authority with respect to the design, construction and permitting of the Highway 160 interchanges given that the interchanges and related improvements will be placed on NFS lands and that CDOT has informed the agency that it, as the property owner, must be a co-applicant with LMJV for the requisite highway access permit.

---

[11]      Whether the Village development meets the regulatory definition of a "connected action" is not as clear, largely because of inconsistencies in the record regarding whether the additional access roads and the Village development have independent utility, that is whether LMJV is capable of developing its property, especially  to the scale it proposes, without the Forest Service approving additional means of access to the planned Village site from Highway 160.  *Compare* FEIS at E.8-7 (WC06628) (justifying failure to categorize Village development as a "connected action" on finding that Village development is not contingent on the Forest Service granting additional access) *with* ROD at  ROD at 13, 14, 16 (WC06786, WC06787, WC06789) (questioning this assumption and finding inadequate access for Village development under "no action" alternative); *cf. Sylvester v. U.S. Army Corps of Engineers*, 884 F.2d 394, 400 (9th Cir. 1989) (proposed and related actions not "connected" under NEPA regulations because one could exist without the other).  These inconsistencies are addressed in the following section.

Based on the current record and the parties' arguments to date, I also find fair grounds for litigation regarding Defendants' assertion that the treatment of the highway interchanges and Village development as cumulative impacts in the FEIS was sufficient under NEPA even if these actions should have been treated as "connected actions" under the statute's implementing regulations. The administrative record reveals there was a heated debate between the Forest Service and Tetra Tech, its EIS contractor, on whether these two actions should be analyzed as connected actions or as cumulative impacts, with the agency ultimately yielding to Tetra Tech's position that the actions need only be addressed as cumulative impacts.[12] Common sense suggests that this debate would not have occurred unless the label attached to these actions made a difference to the content, scope and/or depth of analysis. Given the nature of these related actions and their significant potential impact on the environment, it was also essential that they and impacts be adequately analyzed and considered under NEPA. Whether this occurred here is a matter requiring and deserving of more deliberate investigation.

2.      Alternatives analysis

The requirement that agencies consider alternatives to the action under review is "the heart of the environmental impact statement." *Fuel Safe Washington v. Fed. Energy Regulatory Comm'n*, 389 F.3d 1313, 1323 (10th Cir. 2004) (quoting 40 C.F.R. § 1502.14). As a consequence, NEPA's implementing regulations require agencies to "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from

---

[12]      Outside commentators, including CDOT, also urged that one or both actions be addressed as "connected actions" rather than as "cumulative impacts." *See, e.g.*, Letter from R. Reynolds, CDOT, to R. Dalrymple, USFS (June 30, 2005) (WC01494, Ex. 3 to Pls.' Reply in Supp. of Mot. to Continue Prel. Inj. (Doc. 93-4)).

detailed study, briefly discuss the reasons for their having been eliminated."  40 C.F.R.

§ 1502.14(a).

In deciding whether an agency has adequately identified and considered all reasonable

alternatives, "courts look closely at the objectives identified in an EIS's purpose and needs

statement."  *Fuel Safe*, 389 F.3d at 1323 (quoting *Citizen's Comm. to Save Our Canyons v. U.S.*

*Forest Serv.*, 297 F.3d 1012, 1031 (10th Cir. 2002)).  "Where the action subject to NEPA review

is triggered by a proposal or application from a private party, it is appropriate for the agency to

give substantial weight to the goals and objectives of that private actor."  *Citizens' Comm.*,

297 F.3d at 1030.  Nevertheless, an agency may not "define a project so narrowly that it

forecloses a reasonable consideration of alternatives."  *Fuel Safe*, 389 F.3d at 1324 (quoting

*Davis*, 302 F.3d at 1119); *Citizens' Comm.*, 297 F.3d at 1030.

Plaintiffs argue that the Forest Service's discussion of reasonable alternatives was deficient

in several respects, most notably in its failure to consider any access alternatives that were not

premised on full build-out of the Village.  As a result, Plaintiffs contend, the Forest Service did

not consider a true "no action" alternative as required by NEPA and arbitrarily failed to consider

alternatives that would provide adequate access for reasonable use and enjoyment of LMJV's

property that involves something less than the large-scale, year-round resort proposed by LMJV.

Plaintiffs argue that the omission of these reasonable alternatives prevented the Forest Service

from clearly and fully considering the range of choices and impacts that it could take in response

to LMJV's request for additional access to its property.

I find that this claim presents serious, substantial and doubtful questions presenting fair

grounds for litigation.  In the FEIS, the Forest Service stated that the purpose for its action was to

provide road access and utility corridors to LMJV's property compatible with Ski Area operations, and that this action was needed to meet ANICLA's requirement that it "grant access across Federal lands as deemed adequate to secure the owners [of private in-holdings] the reasonable use and enjoyment of their land, subject to the Secretary's rules and regulations." FEIS at 1-8 (WC05599).  It then employed three premises that affected its identification and analysis of reasonable alternatives to LMJV's access proposal:  (1) that LMJV could and would build the Village as approved by Mineral County in 2004 utilizing FSR 391 even if the Forest Service did not grant it additional access across NFS lands, *see, e.g.*, FEIS at 2-1 to 2-2, 4-194, 4-132 (WC05628-29, WC06001, WC05939); ROD at 14 (WC06787); (2) that "reasonable use and enjoyment" of LMJV's property was full build-out of the Village as approved by the County, *see* FEIS at 1-8, 1-27 (WC05599,  WC05618); ROD at 5, 13 (WC06778, WC06786); and (3) that FSR 391 did not provide adequate access for LMJV to build and operate the Village as proposed, *see* FEIS at 4-194 (WC06001); ROD at 13, 14, 16 (WC06786, WC06787, WC06789).

The mere statement of these premises reveals that the Forest Service's alternatives analysis raises questions ripe for litigation and deserving of more deliberate investigation.  First, there is an undeniable tension between the Forest Service's acceptance of LMJV's representation that it would build and operate the Village using FSR 391, a representation the Forest Service relied upon in analyzing the "no action" alternative, and the agency's determination in the ROD that the FSR 391 was not, in fact, "adequate access" for this purpose.  In the ROD, Forest Supervisor Clark also expressed considerable skepticism regarding LMJV's representations on this point, *see* ROD at 14, 31 (WC06787, WC06804), a skepticism that was well-grounded given the current physical condition of this road, a single lane gravel track with turn-outs that, according to the

FEIS, only "allows for access by passenger cars at slow speeds," FEIS at 1-7 (WC05598), and existing legal restrictions that limit the size and weight of vehicles and bar vehicular traffic entirely from October through mid-June, *id.* In fact, the Colorado district court had found months before the Forest Service issued the FEIS and ROD that it was not possible to construct and operate the proposed Village using the limited access provided by FSR 391, *see Wolf Creek Ski Corp.*, slip op. at 35, and that LMJV's representations to the contrary contradicted its earlier statements, *id.* at 34.[13]   Defining and analyzing the "no action" alternative to include development of the Village based on LMJV's use of FSR 391 was, therefore, highly dubious at best.[14]

Second, the Forest Service's decision to defer to Mineral County's October 2004 approval of LMJV's Village development plan to define the "reasonable use" of LMJV's property, a precondition for the Forest Service to determining "adequate" access under ANILCA, raises several questions of consequence. These include whether the Forest Service abused its discretion in deferring to Mineral County's PUD approval to define "reasonable use and enjoyment" of the property, either as a general matter, *see* 36 C.F.R. § 251.114(a),[15] or because the Forest Service

---

[13]       While it is theoretically possible that FSR 391could be reconstructed to permit its use for construction or operation of the Village, the Forest Service acknowledged in the FEIS and RID that this would require additional Forest Service action and authorization to permit construction vehicles and equipment and traffic, especially if winter access were requested.  *See* FEIS at 1-7, 2-4, 2-14 to 2-15 (WC05598, WC05629, WC05639-40; ROD at 3, 14 (WC06776, WC06787).

[14]       The Forest Service argues that it cured any deficiency in this regard by acknowledging in places in the FEIS that the Village might not be developed under the "no action" alternative and by considering the "no Village development" scenario as the environmental baseline against which all of the alternatives were compared.  *See* FEIS at 32 (WC05623); ROD at 31 (WC06804).  At this point, I am not persuaded by this argument, but will reserve judgment on it until final briefing on the merits.

[15]       The Forest Service's determinations regarding "reasonable use and enjoyment" and access adequate for such use under ANILCA § 1323(a) are not, as LMJV asserts, a matter of the

was aware months before it issued the FEIS and ROD that the state district court had vacated the

2004 approval and remanded it to the County for further consideration and possible modification

when and if the Forest Service granted additional access to the planned development. The Forest

Service's adoption of LMJV's County-approved development plan as the reasonable use and

enjoyment of the property essentially transformed the FEIS's purpose and need for action to the

provision of access adequate to serve LMJV's full-scale development plans. It also drove the

agency's identification and analysis of "reasonable alternatives" to LMJV's access proposal, and

prevented it from considering any alternatives that involved "reasonable use and enjoyment" of

the property other than full build-out of the Village as proposed. Whether the Forest Service

---

Forest Service rubber-stamping whatever use the landowner announces it intends to make of its
property and then providing access adequate to meet this purpose. ANILCA § 1323(a) only
requires the Forest Service to provide access "that the Secretary deems adequate for the
reasonable use and enjoyment" of the property, "subject to such terms and conditions as the
Secretary of Agriculture may prescribe." 16 U.S.C. § 3210(a). By the statute's terms, therefore,
the Secretary must determine what constitutes reasonable use and enjoyment of the lands, what
access is adequate to allow for those reasonable uses and what, if any, terms and conditions
should be placed on that access to meet other statutory and regulatory obligations and goals. *See
id.*; *High Country Citizens' Alliance v. United States Forest Service*, 203 F.3d 835 (10th Cir.
2000) (unpublished). Forest Service regulations governing ANILCA access requests reiterate
these statutory requirements. *See* 36 C.F.R. § 251.114(a) (requiring agency to determine what
constitutes reasonable use and enjoyment of non-Federal lands and to authorize only the access
needed for such use and enjoyment); *see also* Final Rule, 56 Fed. Reg. 27410, 27410 (June 14,
1991) (ANILCA access determination "is a discretionary decision of the authorized officer based
upon given circumstances"). The Forest Service has also acknowledged that ANILCA, while not
authorizing direct control or use of non-Federal land, does "provide[] a basis for determining the
appropriate private access use of Federally owned land," 56 Fed. Reg. at 27411, and "does not
require the authorized officer to allow the construction of [an access] facility on Federal land that
would be required for a use on the non-Federal land that the authorized officer considers to be an
unreasonable use of the non-Federal land," *id.* at 27410. Thus, the Forest Service has stated, its
reasonable use determination under ANILCA may properly limit a landowner's use of non-
Federal land "to the extent that the facilities and modes of access authorized on Federal land limit
the use and enjoyment of non-Federal land to that which is determined to be reasonable by the
authorizing officer." *Id.* at 27412.

acted within the bounds of its discretion in deciding the "reasonable use" question is, therefore, a substantial and serious question that goes to the heart of its NEPA review of LMJV's access request.

### 3. Improper ROD modifications

Plaintiffs have also satisfied their burden of showing a substantial likelihood of success on the merits of their claim that Forest Supervisor Clark's letter of August 28, 2006 constituted an unlawful and arbitrary modification of the ROD.[16]

In the ROD, the Forest Supervisor Clark selected Alternative 4, which authorized and required two access roads to LMJV's property, the Snowshed Road and Tranquility Road, ROD at 2, 5-8 (WC06775, WC06778-81), and designated the Snowshed Road as the primary access to the property, *id.* at 6, 15 (WC06779, WC06788).  Forest Supervisor Clark cited public safety concerns as the critical factor for selecting this alternative over LMJV's proposal that it be allowed to access its property solely via an extended Tranquility Road.  *Id.* at 20-21, 23 (WC06793-94, WC06796).  In particular, Forest Supervisor Clark cited the need for multiple egress/ingress routes to the property for emergency access or evacuations, and the poor road safety conditions at the US Highway 160/Tranquility Road intersection as compared to the Snowshed Road/Highway 160 intersection, as the basis for his decision.  ROD at 20-23 (WC06793-96).

LMJV appealed this decision, requesting that the ROD be amended in one of three ways: (i) to select its proposal for sole access to its property via an extended Tranquility Road; (ii) to

---

[16]     Neither Defendant objected to the magistrate judge's findings and recommendation on this issue.

modify the selected dual access alternative to designate Tranquility Road as the primary access,

with development of the Snow Shed Road conditioned on highway traffic exceeding certain

thresholds; or (iii) to modify the selected alternative to allow LMJV to construct and use

Tranquility Road until design, approval and construction of the Snowshed Road was completed.

LMJV Appeal of ROD at 2, 13 (May 26, 2006) (WC07384, WC07395).  The Appeal Reviewing

Officer ("ARO") recommended that these requests be denied, citing in particular the ROD's

emphasis on public safety concerns:  "During all seasons of the year it is imperative that there be

two roads for access to and egress from the property. . . . One access route does not provide

sufficient emergency access, and this is true whether the property is in the construction stage or

construction has been completed.  Delaying construction of the Snow Shed Road will not serve to

meet the emergency egress routes that public safety requires, described at ROD-20."  ARO

Recommendation at 12 (WC0760).  The ARO also noted that Tranquility Road was not intended

to accommodate the traffic and construction that would be associated with Village development.

*Id.*  Deputy Regional Forester Greg Griffith concurred with the ARO's recommendation and

adopted and incorporated it in his decision denying LMJV's appeal.  Letter-Appeal Decision from

G. Griffith, USFS, to Steven P. Quarles, LMJV counsel, at 5 (July 13, 2006) (WC07663).

Six weeks later, in a letter dated August 28, 2006, Forest Supervisor Clark authorized

LMJV to construct and use the Tranquility Road extension and indefinitely postpone construction

of the Snowshed Road.  Letter from Peter L. Clark, U.S. Forest Service, to David Ross, LMJV

counsel (Aug. 28, 2006) (WC18326-27).  This decision essentially granted LMJV much of the

relief it requested but was denied in its administrative appeal of the ROD .  There is certainly, at

minimum, fair grounds for litigation on the question of whether this decision effectively and

improperly modified the ROD by abandoning its requirements that two access roads be maintained and that the Snowshed Road serve as the primary private property access for public safety reasons.

          4.     Decision based on improper influence and bias

Plaintiffs also claim the Forest Service's access decision was arbitrary and capricious because the FEIS and ROD are the product of an incomplete administrative record and bias as a result of an improper relationship that developed between Tetra Tech, the Forest Service's EIS contractor and agent, and LMJV, the project proponent.   As evidence of this improper relationship, Plaintiffs point to email correspondence indicating that LMJV and Tetra Tech were in routine communication regarding the substance, scope and timing of the FEIS.  Such direct communications and influence were prohibited by the Memorandum of Understanding between the Forest Service and LMJV regarding preparation of the EIS by a third-party contractor.[17] Plaintiffs argue that the Forest Service was aware that LMJV was improperly communicating with and influencing Tetra Tech's work on the FEIS, and yet failed to collect and to investigate these communications and include them in the administrative record so it and the public could assess whether the LMJV-Tetra Tech relationship had violated the integrity of the NEPA and decision-making process.

I have examined the email communications referenced by Plaintiffs and agree with the magistrate judge that they raise serious, substantial, difficult and doubtful questions that are ripe

---

[17]     Defendants' argument that the MOU permitted direct communications between Tetra Tech and LMJV on these topics is not supported by the current record.  Nor is it correct that the specific email communications identified by Plaintiffs only concerned ancillary matters such as payment issues or Tetra Tech information requests to LMJV that might be allowable under the MOU.

for litigation and deserving of deliberative investigation.  The ultimate question to be decided is whether any improper influence by LMJV and resulting contractor bias "compromised the objectivity and integrity of the NEPA process."  *See Ass'ns Working for Aurora's Residential Envt. v. Colorado Dep't fo Transp.*, 153 F.3d 1122, 1129 (10th Cir. 1998) (internal quotations omitted).  The referenced email communications certainly raise this question.  While the Forest Service asserts that its supervision and review of Tetra Tech's work was sufficient to cure any harm to the NEPA process caused by the Tetra Tech-LMJV relationship, this assertion is itself a question of fact requiring further development and investigation.  *Cf. id.* (finding as factual matter that agency exercised sufficient control to overcome NEPA contractor's conflict of interest based on review of agency's substantial role in EIS preparation and review of contractor work product); *Davis*, 302 F.3d at 113 (finding agency failed to take sufficient steps to insulate final NEPA documentation from contractor's biased analysis).  Accordingly, I find Plaintiffs have met their burden of showing a substantial likelihood of success on this claim sufficient to support continuation of the preliminary injunction.[18]

For the reasons stated above, I find Plaintiffs have satisfied their burden of demonstrating that the preliminary injunction should be continued.

---

[18]     My analysis of the merits of this and Plaintiffs' other claims in this decision is, by necessity, based on the argument and evidence presented by the parties in connection with the preliminary injunction issue.  Their arguments, in turn, are necessarily preliminary in nature, especially given the still unsettled status of the already voluminous administrative record for the challenged agency decision.  My ultimate decision on the merits will be based on the final arguments, authority and record evidence presented by the parties in their briefing on the merits.  In preparing these final arguments, the parties should be mindful that my role on the NEPA claims is not to second-guess the wisdom of the Forest Service's access decision, but rather is to determine whether any deficiencies in the FEIS that are ultimately proved are significant enough to defeat NEPA's goals of informed decision-making and informed public comment.  *See Utahns for Better Transp.*, 305 F.3d at 1163.

<u>Injunction Bond</u>

Rule 65(c) provides that a successful applicant for a preliminary injunction post a bond or other security "in such sum as the court deems proper" for the payment of costs and damages that may be incurred by a party who is wrongfully enjoined.  Fed. R. Civ. P. 65(c).  Plaintiffs are both non-profit environmental groups and have submitted declarations by their executive directors stating that they will not be able to proceed with this case if a bond is required.  "The court has discretion to dispense with the security requirement, or to request mere nominal security, where requiring security would effectively deny access to judicial review."  *People ex rel. Van De Kamp v. Tahoe Regional Planning Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985), *amended on other grounds*, 775 F.2d 998 (9th Cir. 1985).  Imposition of a bond requirement in this case would preclude Plaintiffs' request for review of the Forest Service's access decision and frustrate the policies underlying NEPA and the APA.  Accordingly, I will not require Plaintiffs to post a bond in this case.

Accordingly, I accept the magistrate judge's recommendation and GRANT Plaintiffs' Motion to Continue Preliminary Injunction Through Decision on the Merits (Doc. 86).  It is therefore ORDERED that the previously stipulated preliminary injunction, as set forth in the Order entered on November 22, 2006 (Doc. 29), is continued through the date of the final decision on the merits of this action, subject to certain clarifications consistent with this decision, as follows:

1.      Defendant United States Forest Service is ENJOINED from:

A.      Authorizing, through issuance of special use permits, implementation of the terms of such permits, (e.g. pre-requisite pre-work meetings), through written or oral

29

communication, or otherwise, any ground disturbing construction activity on either the Snowshed

or Tranquility Roads, or Forest System Road 391 (FSR 391), except as necessary to respond to

safety and maintenance concerns in and around the proposed project area that are unrelated and

independent of requests by Intervernor-Defendant Leavell McCombs Joint Venture (LMJV) for

access to its private property and/or the Forest Service's response to these requests;

> B.      Submitting any application, or entering into any agreement regarding such

application, to the Colorado Department of Transportation (CDOT) for access permits connecting

the Snowshed or Tranquility Roads, or Forest System Road 391, with U.S. Highway 160; and

> C.      Taking any other action implementing the Application for Transportation

and Utility Systems and Facilities for the Village at Wolf Creek Final Environmental Impact

Statement (FEIS) and Record of Decision (ROD).

> D.      Paragraphs B and C of this injunction do not prohibit the Forest Service

from undertaking meetings or conducting further planning regarding the proposed Village at Wolf

Creek, including the preparation and/or discussion of applications for access, with CDOT,

Intervenor-Defendant LMJV or the owner-operators of the Wolf Creek Ski Area.

> 2.      Intervenor-Defendant LMJV is ENJOINED from engaging in any ground

disturbing construction activity on either the Snowshed or Tranquility Roads, or Forest System

Road 391.

> 3.      This preliminary injunction does not preclude LMJV from utilizing FSR 391 to

access its property in the same manner and subject to the same restrictions as the general public.

If necessary, LMJV may apply for, and the Forest Service may consider and grant or deny, a

special use permit that would allow LMJV to utilize FSR 391 for the limited purposes it proposed

to undertake during the pendency of this action, which are: (a) engaging in investor relations by bringing potential Village investors onto the property; and (b) performing the following activities, all to involve no or minimal ground disturbance:  baseline engineering and design work for Phase I of the proposed Village and Snowshed Road; limited wetland monitoring; surveying; geotechnical investigations; and associated activities.

4.      This injunction shall remain in effect until the Court's final ruling on the merits of the instant administrative appeal.

IT IS SO ORDERED this 4th day of October, 2007.

s/John L. Kane
John L. Kane, Senior District Judge
United States District Court